# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| MISSION WORKING DOGS, a Maine Nonprofit Corporation with a place of Business in Oxford, County of Oxford, and State of Maine, and | ) ) ) ) ) |
| CHRISTINA GARDNER, an adult resident of Oxford, County of Oxford, State of Maine, and | ) ) ) ) |
| ANDRE BEAUDOIN, an adult resident of Lewiston, County of Androscoggin, State of Maine, and | ) ) ) ) |
| TRINA BEAUDOIN, an adult resident of Lewiston, County of Androscoggin, State of Maine, and | ) ) ) ) |
| COLLEEN LANDRY, an adult resident of Auburn, County of Androscoggin, State of Maine, and | ) ) ) ) |
| ANGELICA DWYER, an adult resident of Durham, County of Androscoggin, State of Maine, and | ) ) ) ) |
| JOLEE BEATTIE, an adult resident of Topsham, County of Sagadahoc, State of Maine, and | ) ) ) ) |
| ANASTASIA AMES, an adult resident of Chelsea, County of Kennebec, State of Maine, and | ) ) ) ) |
| JOSHUA GOULD, an adult resident of Auburn, County of Androscoggin, State of Maine, and | ) ) ) ) |
| THERESEA BRILLIANT, an adult resident of Lewiston, County of Androscoggin, State of Maine, and | ) ) ) ) |
| MELANIE SPARKS, an adult resident of Minot, County of Androscoggin, State of Maine, | ) ) ) ) |

**JURY TRIAL REQUESTED AND INJUNCTIVE RELIEF SOUGHT**

CASE NO.

|  |  |
|---|---|
| Plaintiffs, | ) |
|  | ) |
| v. | ) |
|  | ) |
| BROOKFIELD PROPERTIES RETAIL, INC, a foreign corporation registered to do business in the State of Maine with a place of business in South Portland, County of Cumberland, State of Maine, | ) ) ) ) ) ) |
|  | ) |
| and | ) |
|  | ) |
| GGP-MAINE MALL, LLC, a foreign corporation registered to do business in the State of Maine with a place of business in South Portland, County of Cumberland, State of Maine, | ) ) ) ) ) |
|  | ) |
| Defendants. | ) |

## COMPLAINT

The named Plaintiffs make the following complaint against Brookfield Properties Retail, Inc, and GGP-Maine Mall, LLC (dba The Maine Mall) (hereinafter, "the Maine Mall" or Defendants) for discriminating, harassing and retaliating against them, and for falsely imprisoning them for being in the Maine Mall with service dogs.

As set forth herein, the Maine Mall has a pattern and practice of discriminating against individuals who patronize the Maine Mall with service animals by asking them invasive, inappropriate questions about private health matters, requiring patrons with service dogs to present "certificates" for their animals when no such certificates are required by law, unlawfully detaining and publicly humiliating patrons with service dogs while demanding information that the Maine Mall is prohibited by law from requesting, threatening individuals with service dogs with criminal arrest if they oppose the Maine Mall's illegal actions or assert their rights, and throwing out patrons with service dogs in violation of Maine and Federal laws.

2

Plaintiffs file this suit seeking to redress the harm that has been done to them by the Maine Mall and to change the Maine Mall's illegal practices so that they, their loved ones, associates and other disabled persons can patronize the Maine Mall without fear that they will be harassed, humiliated, detained, and discriminated against because they have or are with a service animal.

**Parties**

1. Mission Working Dogs (MWD) is a 501(c)(3) nonprofit run by a disabled female veteran, Christina Gardner. MWD's mission is to aid disabled individuals by training and providing service dogs that can assist individuals with living a full and independent life. In the years since its formation, the organization's dogs have been placed primarily with disabled veterans like Ms. Gardner. MWD's employees, trainers and volunteers are passionate about training service dogs and helping those with disabilities. MWD trains its service dogs to accompany and work with disabled individuals in public accommodations, including the Auburn Mall, Lowes, Home Depot, Marden's, Kohls and Walmart. Until the events that occurred on May 7, 2022, MWD and its volunteers had routinely taken service dogs to the Maine Mall to work and train with and for disabled individuals. Since that date, MWD has not taken service dogs to the Maine Mall out of fear of reprisal, discrimination and harassment.

2. Christina Gardner is the founder and president of MWD. She is also a 100% disabled Army veteran within the meaning of the Americans with Disabilities Act (ADA) and Maine Human Rights Act (MHRA), who is a double leg amputee, has a traumatic brain injury, epilepsy, PTSD and a spinal injury. She was wearing shorts on May 7, 2022, so her disability was open and obvious to the Maine Mall and its employees and agents. Ms. Gardener has a service dog, Douglas, that accompanies her in public, who provides her with mobility assistance and support for her PTSD.

3. Anastasia Ames is a disabled individual within the meaning of the ADA and MHRA with a service dog named Kia. Her disabilities stem from chronic nausea/pain, anxiety, Ehlers-Danlos syndrome, and postural orthostatic tachycardia syndrome (POTS). Collectively, these medical issues substantially limit her ability to move, endure temperature swings and leave her home. Kia helps with Ms. Ames' anxiety, with her digestion and has recently been trained to alert Ms. Ames to gluten, as she has celiac disease.

4. Jolee Beattie is a disabled adult within the meaning of the ADA and MHRA with level 1 autism and an intellectual disability, which limit her major life activities. She has a behavioral health professional (BHP), Angelia Dwyer. Volunteering with service dogs through MWD not only teaches Ms. Beattie about how to manage a service dog but also provides her with significant emotional support. For example, Ms. Beattie typically struggles with being in unknown and/or crowded spaces. On the day of May 7, 2022, the service dog Ms. Beattie was working with alerted her to her stress levels increasing during the confrontation with the Maine Mall's employees by pushing against her and signaling to her that she needed to sit down and calm down with him touching her.

5. Angelica Dwyer is an adult resident of Maine who works as a BHP with Ms. Beattie and was her companion and associate during the events described in this Complaint.

6. Andre and Trina Beaudoin are married adult volunteers with MWD who are the parents and guardians of a disabled adult son. They have been volunteering with MWD for years, as they both feel strongly about the benefits that service dogs can provide to disabled individuals to assist them to participate fully in life.

7. Thereasa Brilliant is an adult MWD volunteer and board member. She has spent hundreds of hours working with service dogs with MWD. Ms. Brilliant is a disabled individual

4

with anxiety and PTSD. Ms. Brilliant has found that working with MWD's dogs helps with her anxiety and PTSD and allows her to get out more in the community.

8. Joshua Gould is a 100% disabled veteran within the meaning of the ADA and MHRA who volunteers with MWD. Before he retired, Mr. Gould was an MP in the Marines, has been a Corrections Officer, worked in the Maine Correctional Center and for the Oxford Casino as a Gambling Control Officer. Mr. Gould was with a service dog named Eleanor at the Maine Mall on May 7, 2022. During his detention by the Maine Mall, Mr. Gould was extremely anxious and upset due to his PTSD and was shaking with his heart racing. Eleanor was alert to his symptoms and working before, during, and after the incident and his unlawful detention. After the incident, Mr. Gould was still physically shaking, upset and he cried.

9. Colleen Landry is an adult volunteer with MWD who was handling a service dog named Hope on May 7, 2022. Hope was working and at no point posed any threat to person or property while she was in the Maine Mall. Ms. Landry was shocked, angry, and distraught at the Maine Mall and it's employees for detaining her and the other plaintiffs and then kicking them out because they had service dogs.

10. Melanie Sparks is an adult volunteer with MWD and was handling a working service dog named Rush on May 7, 2022 in the Maine Mall. At no point during the events at the Maine Mall did Rush ever pose a threat to any person or property at the Maine Mall.

11. Brookfield Properties Retail, Inc. is a foreign corporation doing business in the State of Maine by, on information and belief, jointly owning and operating the Maine Mall in South Portland, Maine.

12. GGP-Maine Mall, LLC. is a foreign corporation doing business in the State of Maine by, on information and belief, jointly owning and operating the Maine Mall in South Portland, Maine.

13. The Maine Mall is a shopping center open to the public located in South Portland, Maine.

## Jurisdiction and Venue

14. This is a proceeding for declaratory and injunctive relief and monetary damages to redress the deprivation of rights secured to Plaintiffs by the Americans with Disabilities Act ("ADA") and the Americans with Disabilities Act Amendments Act ("ADAAA"), 42 U.S.C. § 12101 *et seq.*, the Maine Human Rights Act ("MHRA"), 5 M.R.S. § 4591 *et seq.,* and false imprisonment under Maine common law.

15. On August 23, 2022, Plaintiffs filed a complaint of discrimination with the Maine Human Rights Commission ("MHRC") against Defendants.

16. More than 180 days having passed, the Commission issued a right to sue letter on March 31, 2022, pursuant to 5 M.R.S. § 4612 and § 4622.

17. Plaintiffs have exhausted their administrative remedies and timely filed this action.

18. This court has jurisdiction of the federal claims asserted here pursuant to §§ 1331 and 1343 of Title 28 (28 U.S.C. §§ 1331, 1343). This court has supplemental jurisdiction over the claims in this action arising under the law of the State of Maine pursuant to 28 U.S.C. § 1367.

19. Venue is proper in this district under 28 U.S.C. § 1391(b)(1), in that many of the Plaintiffs reside in this district and a substantial part of the events or omissions giving rise to the claim occurred in this district. In addition, the records relevant to this matter and most of the witnesses are maintained and located within Androscoggin County and Cumberland County, Maine.

## Jury Demand

20. Plaintiffs demand trial by jury of all claims to the extent allowed by law.

**Factual Background**

21. Defendants collectively own and operate the Maine Mall in South Portland, Maine, a place of public accommodation under the MHRA, Maine Human Rights Commission regulations, the ADA and Federal regulations.

22. The Maine Mall has a policy that individuals with both service dogs and service dogs in training are permitted at the Maine Mall, a true and accurate copy of which is attached as ***Exhibit A***.

23. Despite having this policy, the Maine Mall, by and through its agents and employees, have repeatedly stated to disabled patrons and those associated with disabled patrons of the Maine Mall that it has a policy and practice of throwing out members of the public with service dogs unless they can produce a "certificate" of some sort.

24. Under the MHRA and ADA, there is no requirement that a service dog have a certificate of any kind, and public accommodations cannot ask for a patron's medical information, for information about the individual's disability, or proof that a service animal is certified or licensed.

25. In fact, there are only two questions permitted of individuals with dogs in a public accommodation, and these two questions can only be asked if the individual's need for a service animal is not readily observable: (1) "Is the animal necessary because of a disability?" and (2) "What task or service has the animal been trained to perform?"

26. Maine Mall agents and employees are, on information and belief, not adequately and properly trained as to the two permitted questions with respect to service dogs because they routinely ask invasive, illegal questions about patrons' private medical information and needs instead of the only two questions they are permitted to ask.

27. In April or March of 2021, Ms. Gardner was at the Maine Mall with a disabled friend, and she and her friend had their service dogs with them. They were sitting and eating at the food court when a Maine Mall Security Guard came over and started yelling at them because they had service dogs—who were laying down under the table at the time. The Security Guard told them that no dogs were allowed in the Mall. Ms. Gardner and her friend explained that they were service dogs, and the Security Guard indicated it didn't matter and he didn't care because no dogs were allowed. Ms. Gardner said they were not leaving the Mall at that time. The Security Guard stomped off, and Ms. Gardner and her friend quickly finished their meals and left so there was no further confrontation.

28. In another example, on June 22, 2021, Ms. Gardner was at the Maine Mall again with her service dog when a Security Guard detained them for twenty minutes asking a number of rude and inappropriate questions about Ms. Gardner's health and about her dog Douglas—none of which were the two questions she was permitted to ask. The Maine Mall Security Guard also stated that if Ms. Gardener wanted to be in the Maine Mall with her service dog that she would have to call Maine Mall Security in advance to schedule a time when they could come shopping. Ms. Gardner explained that they were allowed to be in the Maine Mall by law and that she didn't have to make an appointment to come and shop because the general public doesn't have to do that. Even after Ms. Gardner asserted her rights and explained the law, including what questions she could ask and that she could be at the Maine Mall with Douglas, the Security Guard kept them detained until she was radioed with an emergency and ran off.

29. On May 7, 2022, the individual Plaintiffs arrived at the Maine Mall a little before 9:00 a.m. for an MWD advanced service dog training class in the Mall. Before they went inside, all of the service dogs went to the bathroom.

30. The service dogs who accompanied the Plaintiffs into the Maine Mall on May 7, 2022, had already received sufficient service training, such that they were able to do work and perform tasks for the benefit of a person with a disability. Indeed, many of the service dogs provided their handlers with invaluable emotional and psychological support during the events set forth in this Complaint.

31. Each individual Plaintiff except Ms. Gardener and Ms. Dwyer had a service dog with them in the Maine Mall. Ms. Gardener was leading the group on behalf of MWD, and Ms. Dwyer was associated with Ms. Beattie as her BHP.

32. The group went into the Maine Mall with their dogs by Best Buy and walked a lap around the Maine Mall for about 45 minutes.

33. MWD has all of its volunteers walk with the dogs in a public accommodation to ensure that they are in no way disturbing or getting in the way of other members of the public. Volunteers keep to the side, yield to all other individuals, including other members of the public, and make sure they are never blocking any path.

34. In their initial walk around the Maine Mall, the Plaintiffs and their service dogs went into several stores, up and down an escalator and then went into JC Penny. At no point were any of the service animals a threat to any person or property, or unrestrained or uncontrolled..

35. Ms. Beattie and Ms. Dwyer, with a service dog, were approached and yelled at by a Maine Mall Security Guard and told that they had to leave the premises because they had a dog. They told the Security Guard that the dog worked with MWD. Ms. Dwyer began crying, which made Ms. Beattie scared because Ms. Dwyer is her BHP and support person.

36. Defendants' Security Guard asked if the dog was a service dog, and Ms. Dwyer said that he was still in training. The Security Guard told her that animals had to be fully trained

before they could come to the Maine Mall, which is contrary to Maine Mall policy and the law. He then physically came toward Ms. Dwyer like he was going to put his hands on her, and she backed away. Ms. Beattie came over and went to go find Ms. Gardner.

37. While Ms. Beattie was gone, the Security Guard tried to physically push Ms. Dwyer out the door. Ms. Dwyer was anxious and cried once the group came out.

38. When Ms. Gardner and the rest of the Plaintiffs came out of JC Penny, Defendants' Security Guard ordered them to leave.

39. Ms. Gardner explained the Maine Mall's policy and law to the Security Guard and asserted their right to be there by law like any other member of the public. In addition, Ms. Gardener explained that the Maine Mall's own policy permitted the group to be there.

40. At this point, the other Plaintiffs were sitting or standing with their dogs on the side of a hallway. None of the dogs were uncontrolled, disruptive or in any way dangerous.

41. Defendants' Security Guard told the Plaintiffs that the Maine Mall can "make their own rules" because the Mall is private property.

42. Eventually the Maine Mall's head of security and manager came out to speak with the Plaintiffs, and Ms. Gardner again explained that the law and the Mall's policy allowed them to be at the Maine Mall. In response, Defendants said that they know their rights and they kick out people all the time if they don't have "certificates" for their service animals.

43. Ms. Gardner told the Maine Mall's representatives that certificates are not required under the ADA, and the Maine Mall representatives said they didn't care.

44. Without authority to do so, the Maine Mall manager ordered the Security Guards to unlawfully detain the Plaintiffs while the South Portland Police were called. Ms. Gardner was specifically threatened that she would be arrested upon arrival of law enforcement.

10

45. Defendants' employees then detained the Plaintiffs and called the South Portland Police Department, who dispatched law enforcement officers to the area.

46. While in detainment, Plaintiffs were publicly guarded and confined by Defendants' Security Guards and forced to sit with their service dogs on the side of a public hallway in the Maine Mall where dozens, if not hundreds, of members of the public gawked at them like criminals.

47. For approximately an hour until South Portland Police showed up, Plaintiffs' freedom and movements were restrained by Defendants' Security Guards. They were told they were forbidden to leave or even go to the bathroom, and the Plaintiffs understood that they were being confined, and that there was a threat of consequences from Defendants or the South Portland Police if they did.

48. Mr. Gould, who has an extensive career in security and law enforcement, informed the Maine Mall's employees that they could not detain the Plaintiffs because it was illegal, and security ignored him.

49. During this period of detention and before, the service dogs were well-behaved and posed no risk to the health or safety of the public or property.

50. South Portland Police arrived around 12:15 p.m., and the officer on the scene noted that "upon arrival all dogs were on leashes laying on the floor with their handlers."

51. Ms. Gardner explained the ADA and Maine law to South Portland Police in front of Defendants' employees and agents and asserted again that Plaintiffs were allowed to be anywhere the public is allowed.

52. The South Portland Police, on instruction by Defendants, nevertheless continued to threaten the Plaintiffs with arrest and criminal charges if they did not leave the Maine Mall, even though such an arrest would itself be illegal under 17 M.R.S. § 1312.

53. Fearing further unlawful arrest, Plaintiffs agreed to leave and were escorted out of the Maine Mall like criminals and told by Defendants' agents and employees that if they came back to the Maine Mall that they would be charged with the crime of trespassing.

54. At no point at all when Plaintiffs were illegally discriminated against and detained did anyone ask the only two permitted questions under Maine and Federal law: (1) is the animal necessary because of a disability, and (2) what task or service has the animal been trained to perform.

55. The individual Plaintiffs left the Maine Mall on May 7, 2022, feeling humiliated, frustrated and/or angry at how they were discriminated against and restrained. Many are vulnerable, disabled individuals, and most have not gone back to the Maine Mall because they are afraid of getting arrested, afraid of being kicked out again because they would need to bring a service dog or are still upset about how they were treated.

## COUNT I:
## Public Accommodation Discrimination under the ADA, 42 U.S.C. § 12112

56. Plaintiffs incorporates and realleges paragraphs 1 through 55 of this Complaint as if fully set forth here.

57. Under the Americans with Disabilities Act, Plaintiffs are disabled persons and/or persons with an association or relationship with disabled persons, as defined by 42 U.S.C.A. § 12102(1)(A) and (E),

58. Under 42 U.S.C.A. § 12181(7)(B), the Maine Mall, owned and operated by Defendants, is a public accommodation.

59. Under 42 U.S.C.A. § 12182(a) and (b)(1)(A)(i), Defendants committed illegal discriminatory acts by asking inappropriate and illegal questions, treating patrons with service dogs differently and worse than patrons without service dogs, unlawfully detaining the Plaintiffs, and ultimately ejecting Plaintiffs from the Maine Mall under threat of criminal action solely

because they were accompanied by service dog and/or associated with individuals with service dogs.

60. Under 28 C.F.R. §§ 36.105 and 36.302(c)(7), a service dog must be permitted to accompany a disabled person, such as the disabled Plaintiffs, into a public accommodation such as the Maine Mall.

61. In acting as alleged in this Complaint, Defendants intimidated, threatened and interfered with Plaintiffs' attempts to exercise their legal rights under the ADA to have a service dog or because they were associated with individuals with service dogs.

62. Defendants afforded the Plaintiffs and others with disabilities, on the basis of a disability, the opportunity to participate in or benefit from the Defendant's facility in a manger that is not equal to that afforded to other individuals, in violation of the ADA and its implementing regulations.

63. Defendants acted with malice or with deliberate conduct or in such a manner that, although motivated by something other than ill will toward any particular party, is so outrageous that malice toward Plaintiffs can be implied.

64. As a direct and proximate result of the intentional discriminatory acts and practices of Defendants, its agents and employees, the Plaintiffs have suffered and continue to suffer injury, including emotional pain and suffering, mental anguish, humiliation, loss of enjoyment of life, embarrassment, damage to their reputations, and other past and future pecuniary losses, including attorneys' fees.

## COUNT II:
## Public Accommodation Discrimination under the MHRA, 5 M.R.S. § 4591, *et seq.*

65. The Plaintiff incorporates and realleges paragraphs 1 through 64 of this Complaint as if fully set forth here.

66. Under the Maine Human Rights Act, Plaintiffs are disabled persons and/or persons with an association or relationship with disabled persons, as defined by 5 M.R.S. §4553-A(1) and §4592(6).

67. The Maine Mall, owned and operated by Defendants, is a public accommodation.

68. Under 5 M.R.S. § 4592, Defendants committed illegal discriminatory acts by asking inappropriate and illegal questions, treating patrons with service dogs differently and worse than patrons without service dogs, detaining the Plaintiffs and ultimately ejecting Plaintiffs from the Maine Mall under threat of criminal action solely because they were accompanied by service dogs and/or associated with individuals with service dogs.

69. In acting as alleged in this Complaint, Defendants intimidated, threatened and interfered with Plaintiffs' attempts to exercise their legal rights under the MHRA to have a service dog or because they were associated with individuals with service dogs.

70. Defendants afforded the Plaintiffs and others with disabilities, on the basis of a disability, the opportunity to participate in or benefit from the Defendant's facility in a manger that is not equal to that afforded to other individuals, in violation of the MHRA and its implementing regulations.

71. Defendants acted with malice or with deliberate conduct or in such a manner that, although motivated by something other than ill will toward any particular party, is so outrageous that malice toward Plaintiffs can be implied.

72. As a direct and proximate result of the intentional discriminatory acts and practices of Defendants, its agents and employees, the Plaintiffs have suffered and continue to suffer injury, including emotional pain and suffering, mental anguish, humiliation, loss of enjoyment of life, embarrassment, damage to their reputations, and other past and future pecuniary losses, including attorneys' fees.

## COUNT III:
## False Imprisonment
### *By the Individual Plaintiffs*

73. The Plaintiff incorporates and realleges paragraphs 1 through 72 of this Complaint as if fully set forth here.

74. As set forth herein, Defendants, by and through its agents and employees, acted with the intent to confine, restrain and detain the individual named Plaintiffs with a certain defined location within the Maine Mall.

75. Defendants detained and confined the individual Plaintiffs against their will and deprived them of their liberty and freedom in gross indifference to their legal rights and the Maine Mall's own polices with full knowledge that Plaintiffs had done nothing wrong.

76. Defendants' actions directly resulted in the restraint and confinement of the Plaintiffs, despite the fact that Defendants knew or should have known they had no legal right to do so.

77. Plaintiffs were, at all pertinent times, conscious of their confinement and the restrictions placed on their liberty and freedom by Defendants.

78. Defendants acted with malice or with deliberate conduct or in such a manner that, although motivated by something other than ill will toward any particular party, is so outrageous that malice toward Plaintiffs can be implied.

79. As a direct and proximate result of their false imprisonment, the Plaintiffs have suffered and continue to suffer injury, including emotional pain and suffering, mental anguish, humiliation, loss of enjoyment of life, medical expenses, embarrassment, damage to their reputations, and other past and future pecuniary losses, including attorneys' fees.

## COUNT III:
**Retaliation, Interference and Intimidation under the MHRA, 5 M.R.S. § 4633**

80. The Plaintiffs incorporates and realleges paragraphs 1 through 79 of this Complaint as if fully set forth here.

81. The Maine Human Rights Act prohibits, *inter alia*, discrimination against individuals who oppose unlawful practices.

82. The Maine Human Rights Act prohibits, *inter alia*, intimidating, threatening and interfering with individuals who are enjoying rights protected by the MHRA, because they have enjoyed rights protected by the MHRA or because they have aided and encouraged other individuals in the enjoyment of those rights.

83. As set forth herein, the Plaintiffs were enjoying their right to visit the Maine Mall on May 7, 2022, like any member of the public can, when the Defendants retaliated against them for being there with well-behaved service animals.

84. Plaintiffs were entitled to be at the Maine Mall like any member of the public and informed agents and employees of the Defendants that they were entitled to be there under Maine law, Federal law and the Maine Mall's own policy. Plaintiffs specifically cited to Defendants what laws allowed them to be at the Maine Mall and pointed out the Mall's own policy to them.

85. Plaintiffs also informed agents and employees of the Defendants that ejecting them from the Maine Mall simply because they had service animals was illegal and that they should not do it.

86. Plaintiffs, in fact, repeatedly implored the Defendants to not discriminate against them, to follow the law and to afford them the same rights as any member of the public to remain at the Maine Mall.

87. Nevertheless, Defendants threatened the individual Plaintiffs with arrest if they did not leave, intimidated the Plaintiffs into remaining confined to a specified area of the Maine

Mall while law enforcement was called, refused to allow the Plaintiffs to continue enjoying the Maine Mall and ultimately ejected them from the Maine Mall with an instruction not to return—all simply because Plaintiffs were enjoying rights protected under the Maine Human Rights Act and stood up for their rights.

88. The callous, indefensible acts of the Defendants have caused and are continuing to cause suffering and injury, including emotional pain and suffering, mental anguish, humiliation, loss of enjoyment of life, embarrassment, damage to their reputations, and other past and future pecuniary losses, including attorneys' fees.

89. Given that Defendants' policy explicitly allowed the Plaintiffs to be at the Maine Mall and that this policy was shown to their agents and employees—who should have already known what the policy was, if not the letter of the law—Defendants' outrageous conduct was plainly engaged in with malice and reckless indifference to Plaintiffs' rights.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court enter an Order providing as follows:

A. Enter judgment declaring that the Defendants' practices complained of herein are unlawful as alleged;

B. For a temporary restraining order, preliminary injunction and a permanent injunction enjoining Defendants, and Defendants' agents, servants, and employees, and all persons acting under, in concert with, or for Defendants from making any discrimination, distinction, or restriction in providing full and equal accommodations, advantages, facilities, and services in Defendant's business establishment, and particularly to be enjoined from doing so as to disabled persons accompanied by service dogs and those associated with such disabled persons;

      C.     Order Defendants to pay Plaintiffs compensatory damages for non-pecuniary losses, including, but not limited to, severe emotional pain and suffering, mental anguish, humiliation, loss of enjoyment of life, embarrassment, and damage to their reputations;

      D.     Order Defendants to pay Plaintiff punitive damages;

      E.     Order Defendants to pay Plaintiffs civil penal damages;

      I.     Order Defendants to pay litigation costs and expert witness fees;

      J.     Order Defendants to pay Plaintiffs nominal damages;

      K.     Order Defendants to pay pre-judgment, post-judgment interest, and reasonable attorneys' fees to Plaintiffs;

      L.     Order Defendant to pay any and all sums as are just in the premises; and

      M.     Grant such additional relief as this Court deems appropriate.

                                  /s/ Amy Dieterich
                                  Amy Dieterich, Esq.
                                  *Attorney for Plaintiffs*
                                  SKELTON TAINTOR & ABBOTT
                                  500 Canal Street
                                  Lewiston, ME 04240
                                  (207) 784-3200
                                  adieterich@sta-law.com

Date:  June 5, 2023